UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

**DUSTIN ETTINGER**

        **Plaintiff,**                    **CIVIL ACTION NO. 06-CV-13754-DT**

        vs.                                **DISTRICT JUDGE ARTHUR J. TARNOW**

**COMMISSIONER OF**              **MAGISTRATE JUDGE MONA K. MAJZOUB**
**SOCIAL SECURITY,**

        **Defendant.**
_____/

## REPORT AND RECOMMENDATION

**I.    RECOMMENDATION**

This Court recommends that Defendant's Motion for Summary Judgment be **GRANTED** (Docket # 13), that Plaintiff's Motion for Summary Judgment be **DENIED** (Docket # 8), and that Plaintiff's complaint be **DISMISSED.**

**II.    PROCEDURAL HISTORY**

This is an action for judicial review of the final decision by the Commissioner of Social Security that Plaintiff was not "disabled" for purposes of the Social Security Act. 42 U.S.C. §§ 423, 1382. The issue for review is whether the Commissioner's decision is supported by substantial evidence.

Plaintiff Dustin Ettinger filed an application for Supplemental Security Income ("SSI") with a protective filing date of January 9, 2003. (Tr. 61-75). He alleged he had been disabled since January 9, 2003 due to a bipolar disorder. (Tr. 61, 65, 249). Plaintiff's claim was denied upon initial review. (Tr. 25-28). Plaintiff sought a review hearing before an Administrative Law Judge (ALJ). (Tr. 29). A hearing took place before ALJ Eve Godrey on November 9, 2005. (Tr. 244-78). Plaintiff was represented at the hearing. (Tr. 56-57, 246). The ALJ denied Plaintiff's claim in an opinion issued on February 24, 2006. (Tr. 13-23). The Appeals Council denied review of the ALJ's decision on July 14, 2006 and the

ALJ's decision is now the final decision of the Commissioner. (Tr. 3-12). Plaintiff appealed the denial of his claim to this Court and both parties have filed motions for summary judgment.

### III. <u>MEDICAL HISTORY</u>

#### A. <u>Medical History Prior to Amended Onset Date</u>

On February 28, 2001 Plaintiff was admitted to the Pine Rest Christian Hospital for psychotic behavior. (Tr. 103-26). He was 17 years old at the time. Plaintiff's parents reported upon admission that Plaintiff had been acting "odd" for the past five weeks. He was not attending school or sleeping for more than a few hours a day. Plaintiff was also using marijuana and stating that he needed to "party all night and drive fast." (Tr. 123). Plaintiff admitted that he started using marijuana in the 6th grade and currently used it about 3 times a day. (Tr. 124).

A few days prior to his admission Plaintiff had been arrested and jailed for intoxication although a subsequent blood test was only positive for marijuana. He had been running into traffic with a baseball bat because there were "too many cars on the road." Plaintiff also thought that everyone had "red devil eyes" and he "rock[ed]" to music that no one else could hear. (Tr. 123-24).

It was noted during Plaintiff's mental status examination upon admission that Plaintiff was agitated and apparently reacting to unseen stimuli. Plaintiff denied any problems with depression, concentration, or attention. (Tr. 124-25). He also denied suicidal ideation but stated that he heard voices yelling at him. Plaintiff was diagnosed with a mood disorder, not otherwise specified ("NOS"), rule out bipolar disorder and psychotic disorder. (Tr. 125). He was assigned a Global Assessment of Functioning ("GAF") score of 10 and it was noted that his highest GAF score in the past year was 65. (Tr. 126).

Psychological testing showed that Plaintiff presented both psychotic and neurotic-based concerns. Plaintiff had significant paranoid and persecutory ideation, anger and hostility, a depressive

pathology, and a history of substance abuse. (Tr. 105-06). During the course of Plaintiff's hospitalization Plaintiff underwent individual, group, and family therapy to treat these issues. (Tr. 106-09). He was also prescribed various medications, including Wellbutrin, Lithium, and Risperdal. (Tr. 109-10). Plaintiff was discharged on March 9, 2001 in an improved condition with directions to follow-up with outpatient care. (Tr. 110-11). Plaintiff's discharge diagnosis was mood disorder (NOS), rule out bipolar disorder (NOS), and Cannabis Abuse. It was noted that Plaintiff displayed psychotic symptoms but did not meet the full criteria for any psychotic disorder at that time. Plaintiff's discharge GAF score was 40. (Tr. 109, 111).

In May 2001 Plaintiff was examined by Dr. Narenda R. Patel after the doctor reviewed Plaintiff's mental health history with Plaintiff and Plaintiff's mother. (Tr. 129-30). Dr. Patel noted that Plaintiff was oriented, alert, and cooperative. Plaintiff was also fluent and displayed good comprehension and recall of recent and past events. Dr. Patel reported, however, that Plaintiff's affect was flat. (Tr. 130). All other examination findings were normal. Dr. Patel concluded that Plaintiff had episodic psychosis with no focal findings or other risk factors for psychosis and stated that he would be interested in reviewing Plaintiff's previous psychiatric assessment. *Id.* Dr. Patel also recommended that Plaintiff undergo an MRI and an EEG. *Id.* These subsequent tests were normal. (Tr. 128).

Plaintiff was admitted to the Kalamazoo Psychiatric Hospital on April 30, 2002. (Tr. 132-64). Plaintiff was arrested for violating his probation by testing positive for marijuana and for possessing marijuana. While in prison, Plaintiff refused to take his medication, eat or drink, and he was not sleeping. He was also touching people inappropriately and having hallucinations. Plaintiff's admission diagnosis was bipolar I disorder, most recent episode manic, severe with psychosis and polysubstance abuse. His GAF score was 15.

Plaintiff was treated at the hospital with various medications which were adjusted when needed. He became less confused and exhibited calm, focused behavior. (Tr. 136-37). On May 17, 2002 Plaintiff was discharged in stable condition with directions to follow up with outpatient therapy and to continue his medication, which consisted of Zyprexa and Lithium Carbonate. (Tr. 137). Plaintiff's diagnosis upon discharge remained unchanged but his GAF score was 50. (Tr. 136).

On May 31, 2003 Dr. Jalal U. Ahmed performed a consultative examination of Plaintiff at Defendant's request. (Tr. 176-78). Dr. Ahmed observed that Plaintiff was well-groomed and appropriately dressed. He was also cooperative and calm during the interview. (Tr. 176). Dr. Ahmed also noted that Plaintiff arrived alone at the appointment and had driven himself. *Id.* Plaintiff was in good contact with reality and was oriented as to time, person, and place. However, his self-esteem was low, his mood was mildly depressed, and his affect was blunt. Plaintiff's speech was monotone but clear, coherent, and relevant without pressure of speech, flight of ideas, or overt delusions. Plaintiff stated that he heard vague voices once in a while but had no suicidal ideation. (Tr. 177). During the mental status examination, Plaintiff had good immediate, recent, and past memory skills. He was able to perform calculations and to recognize the similarities and differences between objects. Plaintiff was also able to recite the names of large cities and current events although he had difficulty naming current famous people. He had some difficulty engaging in abstract thinking and exercising judgment. (Tr. 177-78). Dr. Ahmed diagnosed Plaintiff with Bipolar I Disorder with most recent episode manic and Polysubstance Abuse. He assigned Plaintiff a GAF score of 58 and noted that Plaintiff's prognosis was good if he complied with his treatment program. (Tr. 178).

On June 25, 2003 Dr. Linda Brundage, a licensed psychologist, reviewed Plaintiff's medical records and completed a Psychiatric Review Technique form. (Tr. 179-84). Dr. Brundage concluded that Plaintiff had an affective disorder (bipolar syndrome with psychotic features and a mood disorder,

not otherwise specified) and a substance addiction disorder. (Tr. 179-81). In evaluating Plaintiff's functional limitations, Dr. Brundage found that Plaintiff had mild restrictions of daily living, moderate difficulties in maintaining social functioning and concentration, persistence, or pace, and one or two episodes of decompensation. (Tr. 182).

Thereafter Dr. Brundage completed a Mental Residual Functional Capacity ("RFC") form. (Tr. 185-87). Dr. Brundage concluded that Plaintiff was moderately limited in her ability to: (1) understand, remember, and carry out detailed instructions; (2) maintain attention and concentration for extended periods; (3) complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; and (4) interact appropriately with the general public. (Tr. 185-86). In summary, Dr. Brundage stated that Plaintiff had the functional capacity to perform unskilled work. (Tr. 187-88).

The record also contains progress notes dated June 2002 to May 2005 from Plaintiff's mental health treatment sessions with Dr. Roy Meland, Plaintiff's treating psychiatrist, at the Community Mental Health Center. (Tr. 189-239). As part of an initial psychiatric evaluation, Dr. Meland noted in June 2002 that Plaintiff had a bipolar disorder with psychotic features that was currently stable. Plaintiff's mental illness was complicated by the co-morbid use of marijuana and alcohol, dependence upon these substances in the past, and non-compliance with treatment. Dr. Meland indicated that Plaintiff's non-compliance was supported by his parents because they were ambivalent about his diagnosis and overall treatment. (Tr. 223). A mental status examination showed that Plaintiff was dressed appropriately. His speech was clear, coherent, and goal-directed but somewhat concrete. Plaintiff had no homicidal or suicidal ideation or intent and no psychotic processes were present. Plaintiff's mood was euthymic and his affect was slightly bland but reactive. Judgement and insight were

impaired likely due to his history of substance abuse but cognition was intact on testing. *Id.* Dr. Meland assigned Plaintiff a GAF score of 50. (Tr. 224).

In November 2002 Plaintiff was sleeping excessively, had gained weight, and had low energy. (Tr. 218). Nevertheless, Plaintiff was well-groomed and appropriately dressed and his mood was euthymic. Plaintiff's speech was normal, his thought processes were clear and coherent, and his thought content was appropriate. Plaintiff's judgment, insight, and executive level of cognitive functioning were impaired. However, Plaintiff was oriented and alert and his memory was unimpaired. (Tr. 219). Dr. Meland noted that Plaintiff's medication was causing sedation so he adjusted Plaintiff's medications. (Tr. 218-19). Plaintiff's condition was improving as of December 2002 although he still complained of medication sedation. (Tr. 216-17). His mental status examination was essentially unchanged except that his affect was constricted and he had some persecutory delusions. *Id.*

In January 2003 it was noted that Plaintiff was non-compliant with his medication. Nevertheless, Plaintiff's interest in activities was better and his concentration was normal. Plaintiff's attention was variable and he was anxious and irritable. (Tr. 214-15). The rest of Plaintiff's mental status examination was unchanged. Dr. Meland indicated that a new medication would be considered. *Id.* Dr. Meland reported in February 2003 that Plaintiff had recently had a D.U.I. involving alcohol. Plaintiff's energy and interest in activities were low. He was irritable and impulsive. Plaintiff also stated that his medication caused drowsiness. (Tr. 212-13). Plaintiff's mood was depressed and anxious but the rest of his mental status examination was unchanged. *Id.* Dr. Meland began Plaintiff on an additional new medication called Abilify. *Id.*

Plaintiff's condition improved by March 2003. He had increased motivation and appetite. Plaintiff was also sleeping less and his interest in activities was "okay". Plaintiff's mood was euthymic. (Tr. 210-11). Plaintiff returned to Dr. Meland in July 2003 and reported that he was "partying" more.

Dr. Meland and Plaintiff discussed the importance of compliance with his treatment. (Tr. 208-09). Plaintiff's condition worsened by August 2003 because Plaintiff was not taking his medication. Hospitalization was considered and Plaintiff's medications were adjusted. (Tr. 206-07). The next month Plaintiff discontinued taking one of his medications. However, Plaintiff's interest in activities was good. He was sleeping okay and his energy level was normal. Dr. Meland noted that Plaintiff was stable. (Tr. 204-05).

By October 2003 Plaintiff continued to be compliant with Abilify but not with another medication that Plaintiff believed caused sedation. No side effects were reported from the Abilify. Plaintiff also stated that he made plans for the hunting season and that he was sleeping well and had more energy. (Tr. 202-03). Plaintiff was calm with a euthymic mood and equable affect. Plaintiff's memory was unimpaired and his concentration was "okay". His attention was impaired to an unknown degree. Plaintiff's other medications were discontinued and he was kept on Abilify. *Id.* In December 2003 Plaintiff reported that he started a new job at Meijer's working the night shift. Plaintiff reported no medication side effects. His energy level was good and his concentration was normal. No significant changes in Plaintiff's mental status examination were noted. (Tr. 200-01).

Plaintiff reported in January 2004 that his mood was okay. He was released from work due to a groin injury. Plaintiff was keeping active. Dr. Meland noted that Plaintiff appeared stable and was compliant with his medication and reported no side effects. His energy, interest, sleep, and concentration levels were normal. (Tr. 196-97). The next appointment took place in April 2004. Plaintiff had started a new job at a golf course maintaining the greens. Plaintiff appeared stable and continued to be compliant with his medication. (Tr. 194-95). Plaintiff remained stable in July 2004. (Tr. 192-93). Plaintiff missed an appointment in September 2004 and returned the following month. (Tr. 189-91). Plaintiff and Dr. Meland discussed opportunities for work over the winter when the golf

course was closed.  Dr. Meland noted that Plaintiff's compliance with medication and non-use of alcohol was variable.  Plaintiff was appropriately dressed, personable, and calm.  His mood was euthymic and his affect equable.  Plaintiff's speech was normal and his thought processes were clear and coherent with appropriate thought content.  He was alert and oriented with an unimpaired memory.  *Id.*

Treatment notes from January 2005 indicate that Plaintiff failed to show up for his scheduled appointment.  Plaintiff's father indicated that Plaintiff had started a new job and was supposed to call and cancel.  The therapist informed Plaintiff's father that Plaintiff would have to make adjustments in his schedule and arrange for time off to keep his appointments.  (Tr. 233).  Unexpectedly Plaintiff arrived at the office for his appointment later that afternoon.  He was given medication and advised to keep his appointments in the future.  (Tr. 232).

In February 2005 it was noted that Plaintiff was sleeping well, had good interest in activities, and had good concentration.  Plaintiff also reported that he had plans to attend college.  He stated that he was compliant with his medication, which was helpful, and he had no side effects from the medication. (Tr. 236).  Plaintiff was appropriately dressed, personable, and calm.  His mood was euthymic and his affect equable.  Plaintiff's speech, thought processes, and thought content were normal.  Although Plaintiff's judgment, attention, and executive cognitive function were impaired, Plaintiff was alert and oriented with an unimpaired memory.  (Tr. 237)

In May 2005 Plaintiff was sleeping "okay" and his energy level was "okay".  Plaintiff's concentration was variable.  He was compliant with his medication and reported no side effects. Plaintiff also reported that he had been involved in a motor vehicle accident that involved alcohol and had lost his driver's license again.  (Tr. 238).  Plaintiff's mental status examination was essentially unchanged except that Plaintiff's mood was depressed.  (Tr. 239).

Plaintiff's primary treating physician and internist, Dr. B. Rajesh, submitted a form entitled "Medical Source Statement (Mental)" in November 2005. Dr. Rajesh stated that Plaintiff was moderately limited in his ability to relate and interact with supervisors and co-workers. (Tr. 240). He also concluded that Plaintiff was markedly limited in his ability to: (1) understand, remember, and carry out simple, one or two step instructions; and (2) maintain concentration, persistence, or pace. Furthermore, Dr. Rajesh noted that Plaintiff was extremely limited in his ability to: (1) understand, remember, and carry out an extensive variety of technical or complex work; and (2) withstand the stress and pressure associated with an 8-hour workday and day-to-day work activity. *Id.*

## IV. HEARING TESTIMONY

### A. Plaintiff's Testimony

Plaintiff was 22 years old when he testified before the ALJ. He had a high school education. (Tr. 61, 248-49). Plaintiff testified that he worked part-time as a cook and groundskeeper at a golf course but that he could not work full-time because he slept 12 to 14 hours a day, lacked energy, and had difficulty dealing with co-workers. (Tr. 249-51, 260). He indicated that he took Abilify every morning, which caused drowsiness. If he did not have to work at his part-time job he would take a nap after taking his medication. Plaintiff told the ALJ that he had tried various medications but that Abilify had allowed him to function the best. His other medications caused excessive weight gain or even more drowsiness. (Tr. 251-52). Plaintiff further testified that he was being treated by a psychiatrist and that he no longer saw a therapist. He explained that for the past 3 to 9 months his treatment plan only required him to see a psychiatrist every other month as long as he was stable, kept his appointments, and remained out of the hospital. (Tr. 253). Plaintiff stated that he had a hard time concentrating and remembering things and had difficulty dealing with people. (Tr. 254). He used to have auditory hallucinations on a daily basis but his medication kept him stable. However he occasionally still heard

voices, which he tried to ignore. (Tr. 254-56). The voices sometimes told him to go places. (Tr. 256). Plaintiff also testified that he sometimes had one friend come over to play video games but that he mostly spent time with his family. (Tr. 256-57). He went hunting and fishing with his dad and played golf 2 to 3 times a week and participated in a weekly golf league. (Tr. 257-58). Plaintiff usually only played 9 holes of golf because he did not have the energy to play 18. He testified that he became weak and tired and lacked any ambition to play more holes. *Id.* Plaintiff's work at the golf course consisted primarily of mowing the fairways with a mowing machine and his work as a cook usually entailed making pizzas. (Tr. 257). Plaintiff admitted that he had a problem with marijuana in the past and that in May 2002 he was incarcerated for violating his probation by possessing marijuana. (Tr. 259). However, Plaintiff claimed that he no longer used marijuana since that time. *Id.*

### B. Medical Expert's Testimony

Dr. Sidney Bolter testified as a medical expert at the hearing regarding whether Plaintiff's impairment met or equaled the criteria of Listing 12.04, which related to affective disorders. (Tr. 261). Dr. Bolter noted that Plaintiff was initially diagnosed with bipolar disorder, which is an affective disorder categorized under Listing 12.04. However, Plaintiff was later diagnosed with schizophrenia, which is a psychotic disorder that falls under Listing 12.03. Dr. Bolter indicated that these two disorders were often confused and sometimes lumped together. (Tr. 261-62). Dr. Bolter opined that Plaintiff's difficulties were related to schizophrenia rather than a bipolar disorder. Consequently, Dr. Bolter believed that Plaintiff's mental impairment should be evaluated under Listing 12.03. (Tr. 262). He further testified that Plaintiff's schizophrenia was well-controlled with medication although some adjustments were required to give Plaintiff more energy and to adjust his sleep schedule. According to Dr. Bolter, Plaintiff had normal mental status examinations in 2004 and 2005 and he was capable of

performing some work. (Tr. 262). Plaintiff experienced hallucinations but these were fairly well-controlled as was Plaintiff's behavior. (Tr. 262-63).

Dr. Bolter concluded that Plaintiff did not meet or equal any listed mental impairment in that he had only mild restrictions of maintaining daily living, moderate difficulties in maintaining social functioning, mild difficulties in maintaining concentration, persistence, or pace, and no more than two episodes of decompensation since the amended onset date. (Tr. 263-64). Dr. Bolter further noted that Plaintiff would be able to function independently outside of the home with proper adjustment of his medication. (Tr. 263).

Dr. Bolter subsequently opined that Plaintiff was best suited for a non-public type of job while he was under treatment and medication. (Tr. 272-73). Plaintiff could handle being supervised and he could perform simple, repetitive work that was detailed but not complex. (Tr. 273). Dr. Bolter did not believe that pizza-making or working at a golf course would be too complex for Plaintiff to perform. *Id.*

### C. Testimony of Plaintiff's Father and Mother

Plaintiff's mother and father also testified at the hearing. (Tr. 265-72). Plaintiff's father testified that he and his wife were happy with Plaintiff's medication, Abilify. However they felt that his prior medication was making his condition worse. (Tr. 265-66). Plaintiff's father stated that when Plaintiff was at home he would sit in a chair and watch television for a little while but would then fall asleep. Plaintiff slept about 12 to 14 hours a day but sometimes he slept longer. He did not seem to have any other problems. (Tr. 266). Plaintiff's father indicated that Plaintiff was fired from his previous job at a farm because he had a temper and did not get along with his employer. (Tr. 266-67). Plaintiff's father did not believe that Plaintiff could perform full-time work on a sustained basis due to lack of

energy. (Tr. 267-68). He did not know whether Plaintiff could handle living alone outside the home. (Tr. 268).

Plaintiff's mother similarly testified that Plaintiff's prior medication made Plaintiff's condition worse and that she was happy with the Abilify. She stated that she often had to remind Plaintiff to eat and attend to his personal grooming. (Tr. 270). Plaintiff's mother also testified that Plaintiff played video games, golf, football, and baseball with friends or his nephews. *Id.* She estimated that Plaintiff slept 10-12 hours a day. (Tr. 270-71). Plaintiff's mother told the ALJ that it would be "scary" if Plaintiff lived outside their home because Plaintiff had to be constantly reminded to attend to his personal grooming and to eat, and she was not sure that he could cook meals for himself. (Tr. 271-72).

### D. <u>Vocational Expert's Testimony</u>

Gloria Lasoff, a rehabilitation counselor, testified as a vocational expert ("VE") at the hearing. The ALJ posed two hypotheticals to Ms. Lasoff. The first hypothetical individual had moderate limitations in his ability to: (1) understand, remember, and carry out detailed instructions; (2) maintain attention and concentration for an extended period of time; (3) complete a normal workweek without interruptions from psychologically based symptoms and to perform at a persistent pace without an unreasonable number and length of rest periods; (4) interact appropriately with the general public. (Tr. 275). The ALJ asked Ms. Lasoff whether such an individual could perform Plaintiff's past work and Ms. Lasoff responded affirmatively. *Id.*

The second hypothetical individual could perform work that: (1) did not require public contact; (2) involved simple, repetitive, and detailed but not complex tasks; and (3) did not require close supervision by a supervisor. (Tr. 275-76). The ALJ again asked Ms. Lasoff whether such an individual could perform Plaintiff's past work. (Tr. 276). Ms. Lasoff indicated that such an individual could be a farm worker and a greens keeper and in some situations could be a pizza baker. *Id.*

Upon questioning by Plaintiff's counsel, Ms. Lasoff testified that she interpreted a "moderate limitation" to mean "effects but does not preclude." (Tr. 276). Plaintiff's counsel asked Ms. Lasoff whether she equated this degree of limitation with a certain percentage, to which Ms. Lasoff responded negatively. *Id.* Plaintiff's counsel then asked Ms. Lasoff to assume that a moderate limitation meant that 30% of the time a person was unable to perform certain tasks. He then asked whether a person would be precluded from work if that individual was moderately limited in his ability to complete a normal workday or workweek without interruption from psychologically based symptoms or to perform at a consistent pace without an unreasonable number and length of rest periods. Ms. Lasoff testified that such an individual would have difficulty sustaining employment. *Id.*

**V.     LAW AND ANALYSIS**

    **A.     STANDARD OF REVIEW**

Title 42 U.S.C. § 405(g) gives this Court jurisdiction to review the Commissioner's decisions. Judicial review of those decisions is limited to determining whether her findings are supported by substantial evidence and whether she employed the proper legal standards. *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Walters v. Comm'r*, 127 F.3d 525, 528 (6th Cir. 1997). Substantial evidence is more than a scintilla but less than a preponderance; it is "'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Richardson,* 402 U.S. at 401 (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197 (1938)). It is not the function of this court to try cases *de novo*, resolve conflicts in the evidence, or decide questions of credibility. *See Brainard v. Sec'y of Health and Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

In determining whether substantial evidence supports the Commissioner's decision, the Court must examine the administrative record as a whole. *Kirk v. Sec'y of Health and Human Servs.*, 667 F.2d 524, 536 (6th Cir. 1981), *cert. denied*, 461 U.S. 957 (1983). If the Commissioner's decision is supported by

substantial evidence, it must be affirmed, even where substantial evidence also supports the opposite conclusion and the reviewing court would decide the matter differently. *Her v. Comm'r*, 203 F.3d 388, 389-90 (6th Cir. 1999).

B. **FRAMEWORK OF SOCIAL SECURITY DISABILITY DETERMINATIONS**

The Plaintiff's Social Security disability determination was made in accordance with a five step sequential analysis. In the first four steps, Plaintiff had to show that:

(1) he was not presently engaged in substantial gainful employment; and

(2) he suffered from a severe impairment; and

(3) the impairment met or was medically equal to a "listed impairment;" or

(4) he did not have the residual functional capacity (RFC) to perform his relevant past work.

*See* 20 C.F.R. § 404.1520(a)-(e); 20 C.F.R. § 416.920(a)-(e). If Plaintiff's impairments prevented him from doing his past work, the Commissioner would, at step five, consider his RFC, age, education and past work experience to determine if he could perform other work. If not, he would be deemed disabled. 20 C.F.R. § 404.1520(f). The Commissioner has the burden of proof only on "the fifth step, proving that there is work available in the economy that the claimant can perform." *Her*, 203 F.3d at 391. To meet this burden, the Commissioner must make a finding "supported by substantial evidence that [the claimant] has the vocational qualifications to perform specific jobs." *Varley v. Sec'y of Health and Human Servs.*, 820 F.2d 777, 779 (6th Cir. 1987). This "substantial evidence" may be in the form of vocational expert testimony in response to a hypothetical question, "but only 'if the question accurately portrays [the claimant's] individual physical and mental impairments.'" *Id.* (citations omitted).

C. **ARGUMENT**

Plaintiff asserts that the ALJ failed to properly account for the mental limitations caused by his556 mental impairments in the hypothetical he posed to the VE. Therefore, Plaintiff reasons that

-14-

the VE's testimony does not provide substantial evidence to support the ALJ's non-disability determination.

The Commissioner has prescribed rules for evaluating mental impairments. *See* 20 C.F.R. § 404.1520a. The Commissioner first determines whether there is a medically determinable mental disorder specified in one of nine diagnostic categories. *See Ibid.*; 20 C.F.R. Pt. 404. Subpt. P, App. 1 § 12.00A. The clinical findings are referred to as the "A" criteria. Thereafter, the Commissioner measures the severity of a mental disorder in terms of functional restrictions, known as the "B" criteria, by determining the frequency and intensity of the deficits.

According to 20 C.F.R. § 404.1520a(c)(3), the "B" criteria require an evaluation in four areas with a relative rating for each area. Thus, the Commissioner must evaluate the activities of daily living and social functioning and rate those on a five-point scale ranging between none, mild, moderate, marked, and extreme. Limitations in a third area of concentration, persistence, or pace are rated on the same five-point scale. The fourth area of deterioration or decompensation in work or work-like settings calls for a rating of never, one or two, three, and four or more. "The last point on each scale represents a degree of limitation that is incompatible with the ability to do any gainful activity." 20 C.F.R. § 404.1520a(c).

In applying the factors, the ALJ determined at step two that Plaintiff had schizoaffective disorder, bipolar type, in remission, and well-controlled bipolar disorder with psychotic features ("A" criteria) and that his disorders caused him to have: (1) mild restrictions in his activities of daily living; (2) moderate difficulties in maintaining social functioning; (3) mild difficulties in maintaining concentration, persistence, or pace; and (4) no more than two episodes of decompensation since the amended onset date ("B" criteria). (Tr. 17, 21). Based upon these findings, the ALJ concluded that

Plaintiff had severe mental impairments. At step three, however, the ALJ concluded that Plaintiff's mental impairment did not meet or medically equal any listed impairment. *Id.*

Consequently, the ALJ then properly determined Plaintiff's RFC. *See* 20 C.F.R.1520a(d)(3). The ALJ accounted for Plaintiff's mental limitations by confining him to nonpublic work in a competitive workplace on a regular and continuing basis and in a setting with limited interaction with supervisors and coworkers. He also limited Plaintiff to work that was either simple and repetitive or detailed but not complex. (Tr. 17, 20, 22). At step four, the ALJ posed a hypothetical to the VE that incorporated his RFC finding. Based upon the VE's response to this hypothetical, the ALJ concluded that Plaintiff had the RFC to return to his past, relevant work as a greens keeper and farm worker. (Tr. 17, 22).

Plaintiff asserts that the ALJ erred in failing to either adopt or explain his reasons for rejecting the opinion of Dr. Brundage, the state agency psychologist, that Plaintiff had "moderate" difficulties in maintaining concentration, persistence, or pace or more specifically, that Plaintiff was moderately limited in his ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods. Plaintiff further asserts that had the ALJ adopted Dr. Brundage's opinion as to this limitation, then Plaintiff would have been found disabled based upon the VE's testimony.

Contrary to Plaintiff's argument, the ALJ properly considered Dr. Brundage's opinion. As noted by the ALJ, the opinions made by state agency psychological consultants "regarding the nature and severity of a claimant's impairments must be treated as expert opinion evidence of a non-examining source" according to Social Security Ruling ("SSR") 96-6p. (Tr. 17). The ALJ discussed Dr. Brundage's conclusion that Plaintiff had moderate limitations in maintaining concentration, persistence, or pace and the specific limitation at issue in this appeal. The ALJ also noted that Dr. Brundage opined that Plaintiff was able to perform unskilled work despite his moderate limitations in concentration and social

interactions. *Id.* However, the ALJ went on to compare Dr. Brundage's conclusions with those of Dr. Bolter who found that Plaintiff could perform unskilled work that involved simple tasks with limited interaction with coworkers or supervisors. The ALJ then concluded that the evidence as a whole supported the opinion of Dr. Bolter, which included updated medical evidence that had not been available to Dr. Brundage, although the ALJ accepted Dr. Brundage's opinion to the extent she found Plaintiff not disabled and capable of performing unskilled work. (Tr. 17-20). Plaintiff has not challenged the ALJ's factual findings contained within his written opinion, suggested any error resulting from the ALJ's reliance upon Dr. Bolter's expert opinion, or pointed to any portion of Dr. Bolter's opinion that was not contained in the hypothetical posed to the VE. Consequently, the Court concludes that substantial evidence supports the ALJ's RFC finding and ultimate determination of non-disability.

Given the Court's conclusion as noted above, Plaintiff's argument that the ALJ should have found Plaintiff disabled based upon Dr. Brundage's opinion that Plaintiff was moderately limited in his ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods is moot. Nevertheless, the Court concludes that Plaintiff's argument is without merit.

Plaintiff, relying upon *Bankston v. Comm'r of Soc. Sec.*, 127 F.Supp.2d 820 (E.D. Mich. 2000), suggests that a "moderate" limitation as used in the regulations can be quantified as a specific percentage. In *Bankston*, the Court found that one who "often" suffers from difficulties in concentration, persistence, or pace, as used in the old regulations, implies a deficiency in concentration that can be quantified as 50% of the time on a linear scale and which may not be consistent with substantial gainful activity. *Id.* at 826-27.

Plaintiff seeks to equate "moderate" as used in the current version of 20 C.F.R.

§ 404.1520a(c)(3) with that of "often" as used under the old version of that regulation (as both terms fall on the same place in a five-point scale) and further suggests that "moderate" means an inability to perform certain tasks 30% of the time. However, there is no authority that defines "moderate" as meaning a 30% deficit. *See Butler-Wade v. Comm'r of Soc. Sec.*, 2005 WL 361530 *7-8 (E.D. Mich. 2005). The language of 20 C.F.R. § 404.1520 and 20 C.F.R., Pt. 404, Subpt. P., App. 1 § 12.00(A), (B) suggest that a claimant's functional limitations in daily living, social functioning, or concentration/persistence/pace cannot be quantified with mathematical precision. Indeed, as the ALJ discussed, the regulations' language specifically note that an ALJ is not to examine a claimant's ability to perform and complete a certain number of tasks but is rather to assess the nature and overall degree of an impairment's interference with a claimant's overall functioning. *Id.* (Tr. 20). Moreover, the regulations note that a finding of "moderate" in all areas of functioning does not equate with a finding of disability. Similarly, even a finding of "marked", which is more than "moderate", in only one area of functioning does not automatically render an individual disabled. However, if Plaintiff's argument were adopted, then a claimant would be considered disabled solely by virtue of being "moderately" impaired in one area of functioning. *Id.* (Tr. 21). The Court further notes that Plaintiff points to no evidence in the record that would support his hypothetical that "moderate" be defined as a 30% deficit. Even Dr. Brundage, upon whose testimony Plaintiff's relies, opined that Plaintiff was not disabled and could perform unskilled work. Thus it is clear that Dr. Brundage did not concur with Plaintiff's definition of "moderate". Based upon the foregoing, the Court concludes that Plaintiff's argument is meritless.[1]

---

[1] Plaintiff also argues that the ALJ committed reversible error based upon an erroneous interpretation of the VE's testimony. According to the ALJ, the VE testified that Plaintiff could perform his past work even if he were able to perform only 50% of work related activities in terms of concentration, persistence, or pace. (Tr. 21). The Court agrees with Plaintiff that the VE did not render this testimony. However, given that the ALJ did not ultimately adopt Dr. Brundage's

## VI. <u>RECOMMENDATION</u>

The Commissioner's decision is supported by substantial evidence. Defendant's Motion for Summary Judgment (Docket # 13) should be **GRANTED**. Plaintiff's Motion for Summary Judgment (Docket # 8) should be **DENIED** and the Plaintiff's complaint **DISMISSED**.

## VII. <u>NOTICE TO THE PARTIES</u>

Either party to this action may object to and seek review of this Report and Recommendation, but must act within ten (10) days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1) and E.D. Mich. LR 72.1(d)(2). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Sec'y of Health and Human Servs.*, 932 F.2d 505 (6th Cir. 1991). Filing objections which raise some issues but fail to raise others with specificity will not preserve all objections that party might have to this Report and Recommendation. *Willis v. Secretary*, 931 F.2d 390, 401 (6th Cir. 1991). Pursuant to Rule 72.1(d)(2) of the *Local Rules of the United States District Court for the Eastern District of Michigan*, a copy of any objection must be served upon this Magistrate Judge.

---

testimony regarding Plaintiff's moderate limitations in concentration, persistence, or pace and that the ALJ fully articulated his rationale for rejecting Plaintiff's argument that a percentage-based deficit had been established, the Court concludes that such an error was harmless.

Within ten (10) days of service of any objecting party's timely filed objections, the opposing party may file a response. The response shall be not more than five (5) pages in length unless by motion and order such page limit is extended by the Court. The response shall address specifically, and in the same order raised, each issue contained within the objections.


Dated: June 26, 2007                    s/ Mona K. Majzoub
                                        **MONA K. MAJZOUB**
                                        **UNITED STATES MAGISTRATE JUDGE**


## PROOF OF SERVICE

I hereby certify that a copy of this Report and Recommendation was served upon Counsel of Record on this date.


Dated: June 26, 2007                    s/ Lisa C. Bartlett
                                        **Courtroom Deputy**